**UNITED STATES COURT OF INTERNATIONAL TRADE**

NIVEL PARTS AND MANUFACTURING CO., LLC.

*Plaintiff,*

v.

UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,

*Defendants.*

Court No. 26-04642

**NON-CONFIDENTIAL**
confidential information removed from pages 3-5, 7-8, 10-13, 15, and 17

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Eric Emerson
Henry Cao
Mert E. Arkan (admission pending)
Hendricks Valenzuela
Garrett Kays
Steptoe LLP
1330 Connecticut Avenue, NW Washington, DC 20036
Lawrence D. Rosenberg
Schuyler J. Schouten (admission pending)
Nicholas J. Grandpre (admission pending)
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
*Counsel for Nivel Parts and Manufacturing Co., LLC*

**October 20, 2026**

# TABLE OF CONTENTS


**BACKGROUND.** ........................................ **3**

**I. Nivel Has Diligently Sought to Comply With the Antidumping and Countervailing Duty Orders.** ........................................ **3**

**II. CBP's Interim Measures Impose Existential Financial Burdens on Nivel.** ........................................ **6**

**SUMMARY OF ARGUMENT** ........................................ **8**

**ARGUMENT** ........................................ **9**

**I. Nivel Is Likely to Succeed on its Due Process Claim.** ........................................ **9**

**II. Nivel Will Suffer Irreparable Injury Absent Equitable Relief.** ........................................ **16**

**III. The Balance of Equities and Public Interest Factors Favor Nivel.** ........................................ **19**

**CONCLUSION** ........................................ **21**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Signature, Inc. v. United States*,
598 F.3d 816 (Fed. Cir. 2010)....................20

*Butz v. Economou*,
438 U.S. 478 (1978)....................5

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012)....................9

*Goldberg v. Kelly*,
397 U.S. 254 (1970)....................16

*ICON EV LLC v. United States*,
836 F. Supp. 3d 1361 (Ct. Int'l Trade 2026) .................... *passim*

*Kwo Lee, Inc. v. United States*,
24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) ....................19

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)....................20

*Mathews v. Eldridge*,
424 U.S. 319 (1976)....................10, 11, 15

*Nken v. Holder*,
556 U.S. 418 (2009)....................9, 19

*Oman Fasteners, LLC v. United States*,
No. 22-00348, 2023 WL 2233642 (Ct. Int'l Trade Feb. 15, 2023), *aff'd*, 125 F.4th 1068 (Fed. Cir. 2025) ....................17, 19, 20

*Phoenix Metal Co. v. United States*,
2024 WL 2891503 (Ct. Int'l Trade June 10, 2024) ....................10, 14

*Queen's Flowers de Colombia v. United States*,
947 F. Supp. 503 (Ct. Int'l Trade 1996) ....................17, 20

*Roland Machinery Co v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) (Posner, J.) ....................18

*Superior Com. Sols., LLC v. United States*,
811 F. Supp. 3d 1363 (Ct. Int'l Tr. 2025)....................8, 10, 11, 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .....9

**Statutes**

19 U.S.C. § 1517(c)(1)(A) .....19

28 U.S.C. § 1581(i) .....2

**Other Authorities**

*Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Dep't of Comm. Aug. 12, 2025) ..... *passim*

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | | |
|---|---|---|
| NIVEL PARTS AND MANUFACTURING CO., LLC.<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES; U.S. CUSTOMS AND BORDER PROTECTION; and ERIC CHOY, in his official capacity as Executive Director, Trade Remedy Law Enforcement Directorate, Office of Trade, U.S. Customs and Border Protection,<br><br>*Defendants*. | ) | Court No. 26-04642 |

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

No accused party should face the executioner's axe before any meaningful opportunity to defend itself. But that is the situation that Nivel Parts and Manufacturing Co. LLC ("Nivel" or "Plaintiff"), a Florida-based importer and distributor of golf carts, components, and replacement parts, now faces. As applied by U.S. Customs and Border Protection ("CBP"), the "interim measures" authorized by the Enforce and Protect Act ("EAPA") permit government imposition of a corporate death penalty *before* the accused is provided *any* opportunity to refute the Government's allegations. Here, CBP assessed the allegations in secret, based on the then-undisclosed complaints of a self-interested coalition of domestic manufacturers, and unveiled them for the first time to Nivel contemporaneous with the issuance of a draconian penalty, including 500%-plus *retroactive* tariffs on a portion of Nivel's imports. The imposition of that oppressive penalty will force Nivel into bankruptcy before it is even able to respond on the merits—regardless

of how ill-founded the accusations may be. That is wrong, fundamentally unfair, and a clear violation of due process, which requires *at least* notice and a meaningful opportunity to be heard.

That failure of due process entitles Nivel to preliminary relief. ***First***, Nivel is likely to succeed on the merits of its due-process claim. Due process entitles Nivel to, at minimum, notice of the charges against it and a meaningful opportunity to respond *before* CBP determines to impose draconian, bankrupting interim measures. CBP has failed to clear that basic constitutional hurdle. ***Second***, the threatened interim measures will cause Nivel immediate and irreparable injury. Labeling these measures as "interim" makes them no less drastic or terminal. As this Court has repeatedly found—including in a nearly identical case involving interim measures imposed under EAPA on another golf cart importer—the imminent threat of bankruptcy constitutes irreparable harm. *ICON EV LLC v. United States*, 836 F. Supp. 3d 1361 (Ct. Int'l Trade 2026). Moreover, both (1) the harm Nivel's business partners will face if Nivel is forced out of business, and (2) Nivel's loss of goodwill and long-standing commercial relationships are likewise irreparable. ***Third***, both the public interest and balance of the equities favor granting Nivel preliminary relief. The public interest is undermined—not served—by allowing CBP to flout its constitutional obligations to importers, and the equities speak for themselves. Nivel faces bankruptcy; CBP faces only a delay in duty collection.

Because each factor plainly favors preliminary relief, this Court should grant Nivel a temporary restraining order and preliminary injunction enjoining enforcement of the interim measures (except to the extent that they merely extend or suspend liquidation) during the pendency of CBP's EAPA investigation.[1]

---

[1] For the reasons stated in *ICON*, 836 F. Supp. 3d at 1369, this Court has jurisdiction over this action and to fashion this remedy under 28 U.S.C. § 1581(i).

**BACKGROUND**

I. Nivel Has Diligently Sought to Comply With the Antidumping and Countervailing Duty Orders.

Nivel is a U.S.-based importer and distributor of electric golf carts, and parts and components thereof. Ex. 1, Decl. of Donnie Jouppi (Jouppi Decl.) ¶ 2. Nivel has been in business since 1968 and employs approximately 337 employees across its locations in eight states. *Id.* ¶ 3. Nivel offers its merchandise for sale to U.S. consumers through a network of over [ ] dealers nationwide, who sell Nivel golf carts and use Nivel parts to service and refurbish existing vehicles. *Id.* ¶ 4; Ex. 2, Decl. of Christopher Laufersky (Laufersky Decl.) ¶ 2; Ex. 3, Decl. of Derek Gilchrist (Gilchrist Decl.) ¶¶ 2–3; Ex. 4, Decl. of Eric Prescott (Prescott Decl.) ¶ 4; Ex. 5, Decl. of Ben Hodgkins and Shane Kavanagh (Golf-Rides LLC Decl.) ¶ 5. Historically, Nivel imported its golf carts from China, but it has since shifted its procurement from China to Vietnam and Taiwan. Jouppi Decl. ¶¶ 2, 11. Nivel continues to source aftermarket and repair parts for golf carts from China. *Id.* ¶ 2.

On August 12, 2025, the U.S. Department of Commerce ("Commerce") issued antidumping and countervailing duty orders on low-speed personal transportation vehicles (LSPTVs) from the People's Republic of China. *Certain Low-Speed Personal Transportation Vehicles From the People's Republic of China: Amended Final Antidumping Duty Determination and Antidumping Duty Order; Amended Final Determination of Countervailing Duty Investigation and Countervailing Duty Order*, 90 Fed. Reg. 38,759 (Dep't of Comm. Aug. 12, 2025) ("Orders"). The Orders cover finished LSPTVs of Chinese origin, as well as certain unfinished or unassembled LSPTVs of Chinese origin, as defined by the scope, in relevant part:

> An unfinished and/or unassembled LSPTV subject to these orders covers at a minimum a subassembly, also known as a "rolling chassis," which is typically comprised of, but not limited to, a frame or body with front and/or rear suspension components (such as arms,

> springs, axles, spindles, and shafts) installed and powertrain components (including either an electric motor or a gas-powered internal combustion engine) installed or ready for installation.
>
> When imported together with a rolling chassis subject to these orders, other LSPTV components, such as batteries, bumpers, wheel and tire assemblies, cowlings, fenders, grills, kick plates, steering column and steering wheel assemblies, dash assembly, seat assemblies, pedal assemblies, brake assemblies, canopy or roof assemblies, temporary rain enclosures, windshields, mirrors, headlights, taillights, lighting systems, or storage—whether assembled or unassembled, whether as part of a kit or not, and whether or not accompanied by additional components—constitute part of an unfinished and/or unassembled LSPTV that is subject to these orders. The inclusion of other products, components, or assemblies not described here does not remove the product from the scope....

While processing or completion of unfinished LSPTVs and subassemblies as defined in the Orders in a third country does not remove the product from the Orders' scope, to be subject to the Orders, the imported golf cart must contain at least a Chinese-origin "subassembly, also known as a 'rolling chassis,' which is typically comprised of, but not limited to, a frame ... with front and/or rear suspension components ... installed and powertrain components ... installed or ready for installation." *Id.*

The rolling chassis in Nivel's imported carts are not of Chinese origin; rather, the vehicles Nivel now imports contain chassis produced in Vietnam and Taiwan. Jouppi Decl. ¶¶ 9–12 ("{S}ince March 4, 2026, Nivel's imports of golf carts are made in Vietnam using critical components which originate in Vietnam."). Critical chassis components "including [ ] at "a validated manufacturing site in Vietnam, [ ]" "using raw materials sourced from Vietnamese suppliers." Jouppi Decl. ¶ 10; Ex. 6, [ ] Affidavit ¶ 5. Likewise, "{o}ther critical components such as [ ] are also

sourced from Vietnamese suppliers." Jouppi Decl. ¶ 10. In addition to the sworn testimony of Nivel's corporate executives, Vietnamese-origin certificates demonstrate as much. Ex. 7, Vietnamese-Origin Certificates; *see also* [ ] Affidavit.

Similarly, "as part of Nivel's continued efforts to shift its supply chain away from China, Nivel also purchases golf carts manufactured in Taiwan." Jouppi Decl. ¶ 13. Nivel "obtained confirmation that the golf carts imported from Taiwan are of Taiwanese origin." Jouppi Decl. ¶ 13.

As to both Taiwanese and Vietnamese-origin carts, Nivel has taken substantial steps to ensure that the carts have been produced from locally sourced parts and components. To that end, Nivel staff has flown to Vietnam to confirm the capabilities of its production sites and verified that critical components are produced in Vietnam. Jouppi Decl. ¶ 10. Nivel has also received confirmation that its parts are indeed sourced from Vietnam. *See* Ex. 7, Vietnamese Supplier Certifications.

Aside from importing finished carts, Nivel imports parts from Vietnam, Taiwan, and China for sale to its dealers for use in aftermarket or warranty service, but these are not completed LSPTVs or rolling chassis. Many of Nivel's customers report relying on Nivel for parts which they then use to refurbish and maintain golf carts. Laufersky Decl. ¶ 2; Gilchrist Decl. ¶¶ 2–3. Nivel has continued to source these parts from China because they have been in use by its dealer customers for years, and because the parts are of consistent, predictable quality.[2] Jouppi Decl. ¶ 12. However, these parts are not subject to AD/CVD liability because the scope of the Orders does not cover aftermarket parts, and Nivel has complied with the necessary certification requirements

[2] Indeed, it has been reported that domestic manufacturers such as Club Car also import Chinese-origin parts and subassemblies. Lori Ann LaRocco, *President Trump's trade war hits his second-favorite set of wheels, the golf cart*, CNBC, https://www.cnbc.com/2025/04/30/tariffs-target-trumps-second-favorite-set-of-wheels-the-golf-cart.html (last updated May 5, 2025 12:46 PM EDT).

to import these parts. Jouppi Decl. ¶ 2. Nivel is not importing these parts for assembly into complete carts in the United States. Instead, they are being sold as parts.

II. CBP's Interim Measures Impose Existential Financial Burdens on Nivel.

On September 16, 2026, CBP notified Nivel via email that, "{b}ased on a review of available information, {CBP} has determined that there is reasonable suspicion of evasion of antidumping (AD) and countervailing (CVD) duties by Nivel." In the same communication, CBP also notified Nivel that CBP "shall implement the following interim measures":

- Extend liquidation of unliquidated entries that entered before the date of initiation of the investigation (June 18, 2026);
- Suspend liquidation of unliquidated entries entered on or after the date of initiation of the investigation, June 18, 2026, and reject any entry summaries and require a re-file for those entries that are within the entry summary reject period;
- Require "live" entry for all imports of LSPTV from China and Vietnam by the Importers, requiring the Importers to submit proper documentation and all duties prior to release of the merchandise.

The phrase "all duties" referenced in CBP's instructions refers to duties stemming from the Orders. Specifically, Nivel believes that these duties will be imposed at the "all others" AD/CVD rate, *i.e.*, a combined AD/CVD cash deposit rate of 519.23% *ad valorem* on LSPTVs and parts, if Commerce has not determined a separate rate that would apply to that entry. Ex. 8, Email from CBP. In the Notice of Investigation and Interim Measures, CBP reiterated its statutory authority to "requir{e} a single transaction bond or additional security or the posting of a cash deposit with respect to such covered merchandise." Ex. 9, Notice of Initiation of Investigation and Interim Measures at 18 ("Notice of Initiation").

Prior to receipt of these documents, Nivel had received no notification of the EAPA investigation, nor had it been aware of any concerns that CBP might have harbored regarding alleged "evasion" of AD/CVD duties. Jouppi Decl. ¶¶ 19–20. At no prior point did CBP notify Nivel that it had received an EAPA allegation, commenced an EAPA investigation, or was contemplating the imposition of interim measures against Nivel. *Id.* ¶ 21. And critically, CBP *never* afforded Nivel any opportunity to respond to these allegations before determining to impose the interim measures. *Id.* ¶¶ 19-21. Prior to September 16, 2026, CBP issued three Form CF-28 questionnaires to Nivel.[3] However, the CF-28s only addressed a limited set of entries that sometimes included only golf cart parts (*e.g.*, [ ]), did not reference any EAPA allegations or investigation, and did not contemplate interim measures. *Id.* ¶¶ 7, 21; *see also* Ex. 9, Notice of Initiation at 12. And Nivel "was not aware of the basis for CBP's suspicion nor the basis for the allegation that prompted CBP to suspect that Nivel evaded duties." Jouppi Decl. ¶ 20.

At all times, Nivel has substantially cooperated with CBP. *See* Jouppi Decl. ¶ 15 ("Nivel has a history of working collaboratively and transparently with CBP, with several recent examples dating back to February 2025."). Over the past several months, Nivel "provided consistent and transparent responses to the three CF-28s issued by CBP" providing "entry documents including invoices and bills of lading, and production information including bills of materials and supplier information." Jouppi Decl. ¶ 17.

The threatened interim measures would impose severe, indeed fatal, financial consequences on Nivel. First, the measures would require Nivel to pay cash deposits estimated at [ ] on merchandise already entered after June 18, 2026 (*i.e.*, the date on which CBP

---

[3] A fourth CF-28 was received on Friday, October 9, 2026.

initiated the EAPA investigation). Jouppi Decl. ¶ 28. Nivel has access to a line of credit for [ ], but only [ ] of that line is currently available. Jouppi Decl. ¶ 31. In addition to the payment of duties on products already entered, the threat of live entry for pending entries means that Nivel will owe an additional approximately [ ] for goods currently on the water. *Id.* ¶ 29. But even if these on-the-water goods could be diverted or rejected, the duties on the already-imported goods *alone* will render Nivel insolvent. *Id.* ¶¶ 29, 31.

Although CBP has not yet demanded this payment, it could do so at any time. And without preliminary injunctive relief, Nivel will be forced to close its doors. Nivel's bankruptcy would also create substantial spillover effects on Nivel's business partners. Laufersky Decl. ¶ 6. In addition to those dire financial consequences, the interim measures would damage Nivel's goodwill, reputation, business opportunities, and market share. *Id.* at ¶¶ 7-8.

## SUMMARY OF ARGUMENT

The Court should grant Nivel's motion and enjoin the interim measures. First, Nivel is likely to succeed on its claim that CBP violated Nivel's Fifth Amendment right to due process when it imposed interim measures without providing Nivel prior notice or a meaningful opportunity to be heard. This Court's precedent in *Superior Commercial Solutions* and *ICON* already establishes that this is a due-process violation. Moreover, Supreme Court precedent is clear that CBP's denial of additional procedural safeguards to Nivel was unlawful.

The remaining injunctive-relief factors also favor Nivel. Nivel will be irreparably harmed by CBPs unlawful interim measures absent immediate relief. If implemented, the interim measures will immediately force Nivel into bankruptcy, with no opportunity to challenge any determination by CBP at the end of the EAPA investigation. Beyond the imminent threat of insolvency to Nivel, the interim measures would also cause negative irreparable harm on many of Nivel's business

partners and damage Nivel's goodwill, reputation, business opportunities, and market share. Finally, the balance of equities and the public interest, which merge when the government is the defendant, are equally tilted in Nivel's favor. Indeed, the public interest would be seriously undermined if CBP were permitted to violate its constitutional obligations.

## ARGUMENT

Nivel is entitled to preliminary relief. This Court, consistent with its reasoning in the *ICON* case, should require that the Government wield its authority under EAPA consistent with traditional constitutional due process protections. Nivel should be permitted to survive through the pendency of the administrative process in order to have the right to establish that the allegations made against the company are false.

A preliminary injunction is appropriate where a litigant can establish that (1) the movant "is likely to succeed on the merits"; (2) the movant is "likely to suffer irreparable harm in the absence of preliminary relief"; (3) that "the balance of equities tips {in the movant's} favor"; and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also ICON*, 836 F. Supp. 3d at 1370. The third and fourth factors merge where, as here, the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because Nivel can overwhelmingly demonstrate that it satisfies each factor, Nivel is entitled to a preliminary injunction. And because the impact of these interim measures would be catastrophic for Nivel, this Court should grant the requested temporary restraining order.

### I. Nivel Is Likely to Succeed on its Due Process Claim.

The Fifth Amendment's Due Process Clause prohibits the Government from depriving a person of life, liberty, or property without due process of law. U.S. Const., amend. V. In "the EAPA context … an importer participating in an administrative proceeding has a procedural due process right to notice and a meaningful opportunity to be heard." *ICON*, 836 F. Supp. 3d at 1370

(quoting *Superior Com. Sols., LLC v. United States*, 811 F. Supp. 3d 1363, 1376 (Ct. Int'l Trade 2025)). The Government must provide due process whenever a recognized "private interest" is at stake. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). To determine whether the Government has failed its constitutional duty to provide sufficient due process, courts consider "(1) the private interest at stake; (2) the risk of an erroneous deprivation through the procedures used and the probative value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *ICON*, 836 F. Supp. 3d at 1370. Here, CBP's decision to impose drastic interim measures—*before* providing Nivel any notice or opportunity to respond—violates Nivel's due process rights.

***As a threshold matter***, there is no doubt that Nivel has a sufficient "private interest" at stake to trigger a due-process inquiry. *See ICON*, 836 F. Supp. 3d at 1370. This Court has held that while "a party has no legitimate property interest in future imports," importers do have "a protected interest in the proper assessment of duties on goods already imported …" *Id.* at 1370 n.16; *see also Phoenix Metal Co. v. United States*, 2024 WL 2891503, at *9 (Ct. Int'l Trade June 10, 2024).[4] CBP imposed interim measures, retroactively applicable to [ ] containers of golf carts and parts that Nivel entered since June 18, 2026. This is intuitive: imposition of *sui generis* retroactive tariffs warrants due process. Nivel's property right in the proper assessment of duties owed qualifies as a "private interest." And with respect to an importer's private interest in the

[4] The *ICON* court declined to "determine at what exact point goods are considered imported for due process purposes" because it was unnecessary to do so given the facts. As in *ICON*, this Court need not reach that question here. The interim measures imposed on the goods Nivel has already imported are alone sufficient to trigger bankruptcy. Nivel has a sufficient property interest in the proper assessment of duties on those goods to trigger a due-process violation. *See* Jouppi Decl. ¶ 23.

proper assessment of duties subject to an EAPA investigation, this Court has repeatedly held that CBP's pattern of conduct violates the Fifth Amendment's guarantee of due process.

***First***, the private interest at stake is significant. In *Superior Commercial Solutions*, CBP imposed interim measures subjecting unliquidated entries to a combined AD/CVD cash deposit rate of 371.46% *ad valorem* which carried "significant financial consequences." *Superior*, 811 F. Supp. 3d at 1375-76; *see also ICON*, 836 F. Supp. 3d at 1371 (imposing a 519% rate). Here, the private interest is equally significant: CBP threatens to impose a 519.23% *ad valorem* duty on entries worth [ ], imposing a penalty of [ ]. Jouppi Decl. ¶ 28. The Government claims such duties are only "interim" measures. But that label is misleading. In effect, these duties are final and ruinous. As in *ICON*, these measures "are not just temporary deprivations until the EAPA investigation results in a determination that evasion did or did not occur." *ICON*, 836 F. Supp. 3d at 1371. Rather, "{t}hey are deprivations of such immediacy and magnitude that they will cause {an importer} to declare bankruptcy before it can contest the determination." *Id.* For any corporate entity, the private interest could hardly be any greater.

***Second***, additional procedural safeguards would have significantly curtailed the risk of erroneous deprivation. Where the Government fails to provide "additional procedural safeguards" that would increase the "reliability of the existing {} procedures," this factor supports a finding of a due process violation. *Mathews*, 424 U.S. at 343. The *ICON* Court assessed whether procedural safeguards were lacking by first analyzing the evidence that CBP relied on to find "reasonable" suspicion of evasion, including the importer's responses to information requests (*i.e.*, the CF-28s). *See ICON*, 836 F. Supp. 3d at 1371. The information requests were not sufficient safeguards, however, because the requests did not provide an opportunity for the importer "to supplement or

explain its responses before deriving reasonable suspicion." *Id.* Additional notice was necessary to prevent erroneous deprivation by the imposition of "interim" measures.

Nivel's case is identical: Nivel never had a meaningful opportunity to respond to CBP's basis for reasonable suspicion. On June 30, 2026 and July 1, 2026, CBP sent CF-28s to Nivel; CBP cited Nivel's responses to these forms as its basis for reasonable suspicion. Ex. 9, Notice of Initiation at 12. The mere existence of these forms, however—commonly used for routine clerical inadvertence—could not have placed Nivel on express notice of a secret EAPA investigation.

Neither did CBP's inquiry into the specific entries that formed the basis of its reasonable suspicion place Nivel on constructive notice. In *ICON*, this Court assessed whether CBP's basis for reasonable suspicion sufficiently provided the importer an "opportunity…to supplement or explain its responses before deriving reasonable suspicion therefrom." *See ICON*, 836 F. Supp. 3d at 1371. Here, in its Notice of Initiation, CBP expressly relied on entry No. [ ]8783, [ ]1574, and [ ]8631 to arrive at "reasonable" suspicion. Ex. 9, Notice of Initiation at 12, n.94. Entry No. [ ]8783 only concerned a single [ ] Ex. 10, [ ] Exhibits, but nowhere do Commerce's Orders mention [ sound or audio equipment ]. The other identified entries, [ ]1574 and [ ]8631, only included [ ], but the Orders do not cover [ ] unless imported together with a rolling chassis. The entry summaries for these entries indicate that Nivel did not import these [ ] with a rolling chassis and therefore, are outside the scope of the Orders. Ex. 11, [ ] Exhibits. Based on these identified entries that formed the basis for CBP's "reasonable" suspicion, Nivel could not have inferred that an EAPA investigation was ongoing. And without notice, Nivel could not meaningfully respond to allegations of evasion. As a result, Nivel could only respond with "incomplete evidentiary responses" that could lead to "reasonable" suspicion

that "may well have been premature or mistaken." *ICON*, 836 F. Supp. 3d at 1371. CBP's other bases for "reasonable" suspicion were even more one-sided: without any communication with Nivel, CBP reviewed Nivel's "prior entries of covered merchandise" and vague "import-pattern shifts." *See* Ex. 9, Notice of Initiation at 12. Without awareness of those inquiries, Nivel had no chance to respond.

Additional procedural safeguards would have meaningfully reduced the risk of erroneous deprivation caused by CBP's drive-by assumptions. Since the Orders have come into effect, Nivel has worked to source its golf carts from Vietnam and Taiwan—not China. Nivel employees have flown to Vietnam and visited its Vietnamese production site to "confirm its capabilities." Jouppi Decl. ¶ 10. Nivel has verified that "critical components including [ ] at this factory in Vietnam." *Id.* Nivel has received certification from its Vietnamese supplier to confirm that Nivel's parts are indeed sourced from Vietnam. *See* Ex. 7, Vietnamese-Origin Certificates. If provided notice, Nivel could have provided documentation of these activities to lower the risk of an erroneous deprivation.

The Notice of Initiation also demonstrates the apparent need for greater process: the allegations that launched the initial investigation contain self-evidently false assertions. The Notice of Initiation repeats the unfounded allegation that Nivel was importing golf carts as "golf balls" under HTSUS 9506.32 to evade the Orders. *See* Ex. 9, Notice of Initiation at 9. Nivel has examined its imports throughout the entire period under investigation and has identified *no instance* in which it imported *any* merchandise under this HTSUS number. Jouppi Decl. ¶ 23. This is precisely the type of factual rebuttal that a multi-party administrative process enables. Permitting the process to operate—rather than allowing the Government to destroy the company

as an opening step—would meaningfully reduce the risk of deprivations imposed under false premises.

Indeed, while Nivel recognizes that this is not the appropriate forum or juncture to litigate the ultimate merits of CBP's investigation, Nivel believes it will be able to compellingly demonstrate compliance. For all LSPTVs and [ ] that Nivel's Vietnamese supplier, [ ], has produced for Nivel since [ ], the [ ] in those vehicles were not of Chinese origin. Ex. 6, [ ] Affidavit ¶ 4. Rather, [ ] produced key component parts such as the [ ] at its plant in [ ]. *See id.* [ ] documented and certified the country of origin for these parts. Ex. 7, Vietnamese-Origin Certificates. Since March 4, 2026, Nivel's completed LSPTVs or [ ] have been imported from Vietnam through [ ] (and a small amount from Taiwan), in compliance with the Orders. Jouppi Decl. ¶ 2.[5]

To be sure, this Court does not need to resolve CBP's allegation on the merits to grant Nivel relief on its due-process claim. All Nivel must show is that due process would have decreased the *risk* of erroneous deprivation. If provided with a meaningful opportunity to be heard, Nivel could have corrected the errors that CBP's "interim" measures are falsely premised upon—an opportunity Nivel has been denied.

***Third***, the cost to the Government from providing Nivel notice and an opportunity to be heard before racing ahead with "interim" measures is low. When the "benefit of an additional

---

[5] Importantly, Nivel has extensively cooperated with CBP on its investigation and in fact continues to do so, meaning that this is not a case of a non-compliant importer that CBP must ambush or risk losing the opportunity to enforce the law. *Compare Phoenix Metal*, No. 23-00048, 2024 WL 2891503, at *2 ("At verification, Ms. Li informed CBP that the production they were witnessing was set-up only for verification purposes, accused the agents of being spies, shouted at them, refused to turn over requested paperwork, and tried to interfere with CBP's interviews of employees.").

{procedural} safeguard" outweighs the Government's "fiscal and administrative resources" to provide such a safeguard, this factor supports a finding that the Government violated constitutional guarantees. *Mathews*, 424 U.S. at 348. In a nearly identical EAPA investigation, the *ICON* Court considered the procedural safeguards necessary to plausibly satisfy due process: clear notice of EAPA allegations; an opportunity to supplement responses to those allegations including "documentary evidence;" and CBP review of the supplemental evidence. *ICON*, 836 F. Supp. 3d at 1371. In assessing the costs of providing such process, the Court found that these procedural safeguards "would impose few fiscal and administrative burdens on the Government that it has not already accounted for." *Id.*

This Court should find no differently. As in *ICON*, here, the Government needed to provide Nivel notice of the EAPA allegations levied against it, an opportunity to respond to the allegations, and diligent review of Nivel's response. As in *ICON*, costs would have been minimal. In fact, providing such safeguards would have *reduced* the overall cost to the Government by "enhanc{ing} the reliability of information and the impartiality of the decisionmaking process," leading to a "less pressing need for individual suits to correct constitutional error." *Butz v. Economou*, 438 U.S. 478, 512 (1978). This rings especially true in this case, where Nivel has consistently responded to CBP inquiries in good faith, providing full and thorough responses. For example, on June 8, 2026,[6] CBP issued a CF-28 to Nivel inquiring about entry No. [ ]4972. In response, Nivel produced thorough documentation including a bill of lading, purchase orders, a bill of materials, manufacturer invoices, and certificates of origin. If informed of the latent EAPA allegations, Nivel would have provided similar information, lessening the need

[6] This inquiry predated the initiation of the EAPA investigation and therefore could not provide notice of the future investigation.

for a full-blown investigation and decreasing the Government's costs. For these reasons, the Government interest factor also supports a ruling that the Government failed to provide due process.

Thus, CBP's conduct in imposing the interim measures is, as this Court has repeatedly held—first in *Superior Commercial Solutions* and again in *ICON*—a violation of due process.

* * *

Nivel stands "to suffer grievous loss" in the form of insolvency before it can even contest the allegations against it. *Goldberg v. Kelly*, 397 U.S. 254, 263 (1970). Such a scenario is *exactly* what the Due Process Clause is meant to guard against—and the Government cannot circumvent *its* constitutional duty by recasting existential penalties as mere "interim" measures. The Government owes Nivel the due process it was wholly denied. For these reasons, Nivel is likely to succeed on the merits of its due-process claim.

II. <u>Nivel Will Suffer Irreparable Injury Absent Equitable Relief.</u>

If the interim measures described in the Notice of Initiation are imposed, Nivel will be forced to file for bankruptcy. Jouppi Decl. ¶ 26. As stated, those measures would require Nivel to immediately pay [ ] on already imported merchandise. Jouppi Decl. ¶ 28. That liability *alone* would render Nivel insolvent. Jouppi Decl. ¶ 30. No amount of cost cutting would allow Nivel to generate sufficient funds nor would Nivel be able to secure financing to meet the Government's demands. And *even if* Nivel could afford to pay such duties on *previously* entered products, Nivel cannot continue to operate if a 500%-plus cash-deposit requirement is imposed on *future* entries. *See* Jouppi Decl. ¶ 27 ("These rates are so high that they effectively function as a ban against our golf carts…"). In short, these interim measures amount to a financial death sentence.

Moreover, the interim measures would curtail Nivel's access to credit—making bankruptcy all the more inevitable. Specifically, Nivel lacks the liquidity to acquire credit and raise the funds it would need to pay CBP's threatened duties. In short, the "interim" measures, if implemented, would "place a chokehold on {Nivel's} cash flow." *ICON*, 836 F. Supp. 3d at 1372 n.17.

CBP's imposition of a ruinous 500%-plus tariff would be fatal for Nivel. And like all death sentences, this one is irreparable. In case after case, this Court has held that the imminent threat of insolvency constitutes irreparable harm—thus justifying a preliminary injunction. *See, e.g.*, *ICON*, 836 F. Supp. 3d at 1372 ("ICON alleges a real threat of extinction … that will not be sufficiently compensated by money damages"); *Oman Fasteners, LLC v. United States*, No. 22-00348, 2023 WL 2233642, at *11 (Ct. Int'l Trade Feb. 15, 2023) ("This looming insolvency constitutes irreparable injury."), *aff'd*, 125 F.4th 1068 (Fed. Cir. 2025); *Queen's Flowers de Colombia v. United States*, 947 F. Supp. 503, 507 (Ct. Int'l Trade 1996) (finding irreparable harm where imposition of cash deposit rate would "force each of the eight {importers} out of business within an extremely short time period, eliminating their opportunity for future corrective judicial relief").

Just as in each of those cases, Nivel—a "long-standing" corporation that "has accrued goodwill through the effort of its owners over the course of its existence"—is "threatened with extinction." *ICON*, 836 F. Supp. 3d at 1372. And just as in *ICON*, Nivel has presented credible evidence—"in concrete terms by its corporate representative"—that the threat is both *real* and *imminent*. *See* Jouppi Decl. ¶¶ 25–32 (detailing the "immediate financial burden on Nivel" if the company is forced to comply with the threatened interim measures). And Nivel's latest financial reports likewise demonstrate concrete proof of its inability to meet CBP's steep demands. Ex. 12, [ ] Consolidated Financial Statements ( [

]). Without preliminary relief, Nivel will cease to exist—well before it even has an opportunity to refute CBP's allegations on the merits. Any later relief would "come too late to save the plaintiff's business." *Roland Machinery Co v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (Posner, J.).

Beyond the imminent threat of insolvency (which alone is sufficient to support a finding of irreparable harm), the interim measures will impose several further irreparable harms. ***First***, Nivel's bankruptcy will also impose serious harm on its business partners—themselves U.S. manufacturers and distributors. Gilchrist Decl. ¶ 2; Laufersky Decl. ¶ 2. If Nivel cannot procure merchandise, it will be unable to continue its business relationships with its customers—several of whom have provided affidavits explaining the dire consequences they would face if Nivel were to cease its operations or otherwise cease its ability to meet its supplier obligations. *See e.g.*, Laufersky Decl. ¶ 7.

***Second***, the threatened interim measures would damage Nivel's goodwill, reputation, business opportunities, and market share. Nivel's bankruptcy will result in the loss of goodwill from significant downstream distributors, who have stated that if Nivel becomes insolvent, they would be forced to find another golf cart supplier. *See* Laufersky Decl. ¶ 7 ("It is difficult to divest from a relationship as interconnected as the one we have with Nivel…we would have no alternatives than to…find other suppliers to meet our demand."). These illustrate the real effects of these punishing interim measures—the loss of future goodwill, reputation, and market share that Nivel has taken years to build. Those injuries, too, are plainly irreparable. The permanent severing of established business relationships is exactly the kind of irreparable harm that justifies a preliminary injunction. *See, e.g.*, *ICON*, 836 F. Supp. 3d at 1373 ("{T}he interim measures will have an immediate and lasting effect not just on its current sales, but on future goodwill, reputation,

and market share absent injunctive relief."); *Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1328 (Ct. Int'l Trade 2014) (finding irreparable harm where plaintiff's reputational damage among his domestic customers was caused by his failure to deliver, stemming from his inability to pay the fully collateralized bond amount); *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." (citation omitted)).

In short, the interim measures threaten to impose "serious harm which cannot be undone." *Oman Fasteners*, 2023 WL 2233642, at *9. That harm, "economic or otherwise," plainly constitutes irreparable harm. *Id.*

III. <u>The Balance of Equities and Public Interest Factors Favor Nivel.</u>

Finally, both the balance of the equities and the public interest—which merge when the Government is the defendant, *see Nken*, 556 U.S. at 435—strongly favor Nivel. The balance of the equities requires this Court to "weigh the harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted." *ICON*, 836 F. Supp. 3d at 1373 (quoting *Metalcraft of Mayville, Inc. v. Toro Co.*, 848 F.3d 1358, 1369 (Fed. Cir. 2017)). Here, that balance is about as "lopsided{}" as it gets. *Oman Fasteners*, 2023 WL 2233642, at *13. Nivel does not seek to enjoin CBP from conducting its EAPA investigation for substantial evidence or suspending liquidation during its inquiry. The only possible harm that preliminary relief would impose on the Government is delayed receipt of the money the government alleges Nivel owes as an "interim" deposit. But this delay is not indeterminate or even extended. EAPA requires a "determination, based on substantial evidence" not later than "300 calendar days after" an investigation is initiated. 19 U.S.C. § 1517(c)(1)(A). If the Government can prove the merits of its case, it would recover the amount owed *in full*. But for now, on one side of the ledger, the Government faces a temporary delay in collecting a *deposit* of an amount that makes no more than

a dent in the public fisc. On the other side of the ledger, Nivel faces violation of its constitutional rights and economic "catastrophe." *Oman Fasteners*, 2023 WL 2233642, at *13. This is no contest.

The public interest is equally tilted in Nivel's favor. "The public interest is served by ensuring that governmental bodies comply with the law, and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010); *see also Queen's Flowers*, 947 F. Supp. at 1127 ("public interest in meaningful judicial review of unlawful administrative action, particularly in an instance … where the potential unlawful {action} … threatens … economic extinction"). By contrast, the public interest would be seriously undermined if CBP were permitted to flout its constitutional obligations to importers. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having government agencies abide by the federal laws that govern their existence and operation." (cleaned up)). As this Court has already observed, EAPA serves an important public interest, but "the Constitution ... does not permit the government to prioritize any policy goal over the Due Process Clause." *ICON*, 836 F. Supp. 3d at 1373 (internal citations and quotations omitted). As in *ICON*, the balance of equities and public interest favor preliminary relief.

## CONCLUSION

For these reasons, the Court should grant Nivel's motion for a temporary restraining order and enjoin certain aspects of the interim measures. Nivel does not contest the extension of liquidation of unliquidated entries that entered before June 18, 2026 or the suspension of liquidation of entries made subsequent to June 18, 2026. Nivel's request for relief is limited to the immediate and crushing imposition of cash deposits on these entries without due process.

Dated: October 20, 2026

Respectfully submitted,

/s/ Eric Emerson
Eric Emerson
Henry Cao
Mert E. Arkan (admission pending)
Hendricks Valenzuela
Garrett Kays
Steptoe LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
+1.202.429.8076
eemerson@steptoe.com
/s/ Lawrence D. Rosenberg
Lawrence D. Rosenberg
Schuyler J. Schouten (admission pending)
Nicholas J. Grandpre (admission pending)
Jones Day
51 Louisiana Avenue, N.W. Washington,
D.C. 20001-2113
+1.202.879.7622
ldrosenberg@jonesday.com
*Counsel for Nivel Parts and*
*Manufacturing Co., LLC*

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing submission complies with the word-limitation set forth in Standard Chambers Procedure 2(B)(1), and contains 6,337 words.

Dated: October 20, 2026

/s/ Eric Emerson
Eric Emerson